DARIUS L. VIGUS

v.

MATILDA O'BANNON, Executrix, etc.

1. EVIDENCE—FRAUD.—In 1874, appellee's husband was appellant's agent to collect a policy of insurance of $5,000. He reported to appellant that the company disputed the claim on the ground of misrepresentation on the part of the insured, and that they would pay only $2,000. Upon these representations appellant accepted the amount and signed a receipt. In 1883 appellee's husband died, and about that time appellant, being informed that appellee's husband had receipted to the insurance company for $5,000,

filed a claim for $3,000 against his estate, alleging that the cause of action had been fraudulently concealed from him. Appellee contested, denying the alleged collection and setting up the Statute of Limitations. *Held*, under the evidence in this case, the court was justified in disallowing the claim.

2. Statute of Limitations.—In order to bring a case within the exception made by section 22 of the Statute of Limitations, the law requires reasonable diligence. Where relations of trust and confidence exist, a lesser degree may be reasonable than would be so if the parties were strangers or dealing at arm's length. Faith, however sincere, which neglects work where reason demands it, is not accepted by the law as a substitute for diligence.

Appeal from the Circuit Court of Montgomery county; the Hon. J. J. Phillips, Judge, presiding. Opinion filed February 25, 1886.

Mr. George L. Zink and Mr. James M. Truitt, for appellant; as to proof of fraud, cited Bigelow on Fraud, 476; Bump on Fraudulent Conveyances, §§ 541, 560; Carter v. Gunnels, 67 Ill. 270; Bullock v. Narrott, 49 Ill. 62; Bryant v. Limoncau, 51 Ill. 324.

As to reasonable diligence: Buckner v. Calcate, 28 Miss. 431; Wilson v. Ivy, 32 Miss. 233; Bigelow on Fraud, 445; Harrisburg Bk. v. Foster, 8 Watts (Pa.), 12; Way v. Cutting, 20 N. H. 287; Atlantic Nat. Bk. v. Harris, 118 Mass. 147; Wear v. Skinner, 46 Md. 257.

Mr. R. McWilliams, Mr. L. Allen and Messrs. Lane & Cooper, for appellee; that there is no fraudulent concealment of the cause of action within the meaning of section 22 of our statute, cited Cole v. McGlathey, 9 Me. 131; McKown v. Whitmore, 31 Me. 448; Street v. Henting, 24 Kas. 497; Sutton v. Dye, 68 Ga. 449; Freeman v. Kroner, 59 Ga. 161; Foster v. Rison, 17 Grat. 322; Finly v. Stewart, 40 Ia. 603; Wood v. Carpenter, 101 U. S. 135; Nudd v. Hamblin, 8 Allen, 130.

Appellant had the means of knowledge of the supposed concealment, and this was equal to knowledge itself: Wood v. Carpenter, 101 U. S. 135; Buckner v. Calcate, 28 Miss. 596.

PLEASANTS, J. Mrs. Eliza Vigus, mother of appellant, held a policy on her life in the Protection Life Ins. Co. of Chicago, payable to him at its office within ninety days from the receipt of proof of her death. She died at Raymond October 12th, and proof was submitted Nov. 28th and approved Dec. 16th, all in 1874. Early in January, 1875, Richard W. O'Bannon, at the request of appellant, took the policy to Chicago to settle and collect the insurance. Upon his return he reported that the company disputed the claim on the ground of misrepresentation as to her health when insured, but that he had succeeded with difficulty and only through the personal friendship of the secretary, in getting an allowance of $2,000, and no more. He presented to appellant its check on the Fidelity Savings Bank and Safe Depository of Chicago and its note at sixty days, each for $1,000, dated Jan. 5, 1875, and payable to appellant, together with a receipt to it in full, but not specifying the amount, which was in the handwriting of A. W. Edwards, said secretary; and upon his statement and advice appellant accepted the note and check, and signed the receipt which was returned to the company and by it received on Jan. 9, 1875.

O'Bannon was then between sixty-five and seventy years of age. His son had married a sister of appellant, and his own personal relation with him and his family had been intimate, and so continued to the time of his death. He died Nov. 15, 1883, after a residence in the county of thirty years.

About that time appellant was informed that O'Bannon had receipted to the insurance company for $5,000, and on June 30, 1884 filed in the county court the claim here in controversy, which is for $3,000 and interest thereon from March 14, 1875, alleging that the cause of action had been fraudulently concealed from him.

Appellee contested, denying the alleged collection by her testator and setting up the Statute of Limitations. The cause was tried without a jury and the claim disallowed. The claimant appealed to the circuit court, where it was again tried without a jury, and the issues were found and judgment rendered for defendant. Exception thereto was duly taken and the record is brought here by further appeal.

If O'Bannon collected on this policy, directly or indirectly, anything more or else than the check and note he delivered to appellant, either before he delivered them or afterward, if in pursuance of a purpose formed before, it must be conceded upon the evidence that he fraudulently concealed this cause of action, and that appellant was actually ignorant of it until a time within five years before the filing of his claim. The main questions of fact, then, are whether he did collect more, and if so, whether appellant's ignorance was due to a want of reasonable diligence to discover it.

It sufficiently appears that the company actually paid $5,000, so that if appellant received only $2,000, either he or the company must have been defrauded of the difference by O'Bannon or some other person or by both; but the narrowed range of our inquiry is whether the fraud was committed by O'Bannon and upon appellant.

The receipt indorsed on the policy is as follows: "Received of the Protection Life Insurance Company five thousand dollars, being the amount in full on the within policy. D. Vigus, by R. W. O'Bannon," and the signature is admitted to be in the handwriting of the latter, which unexplained would doubtless be conclusive against him.

Some evidence was introduced which tended to show that the word "five" was originally written "two," and other, perhaps of greater weight, that there had been no alteration.

But it was fully proved that the body of this receipt, excepting the amount therein stated, was written by the head book-keeper of the company, who also wrote the check and the note mentioned; that though without date, it was in fact written and delivered to the secretary, with a blank space left for the insertion of the amount, on the 5th day of January, 1875—the date of said check and note—while O'Bannon was in the office, and nothing further is shown respecting the policy or this receipt until the fall of 1883. It further appears without dispute that the company paid no money directly, at any time, on account of this policy, but always and only by check on its bank; that all it gave on that account to O'Bannon or any other person on January 5th was the check

and note mentioned; that the note was entered at the time on its books, introduced in evidence by appellant, as given "*for balance due* on policy 4266, on death of Eliza Vigus," thus apparently showing the whole amount to be $2,000 ; that the other $3,000 was paid by check which was not issued until two months afterward, March 4th, nor paid by the bank until June, and that it was filled out by the book-keeper, made payable to appellant, and delivered to Edwards, the secretary. O'Bannon was not in Chicago on March 4th, nor is there any evidence that after he left in January he ever had any dealing or correspondence, directly or indirectly, with the insurance company or any of its officers, or with the bank on which these checks were drawn. He resided at Raymond until the latter part of May, 1875, when he removed to Litchfield, some twelve miles distant, where he had formerly lived, and there remained until his death. The $3,000 check was returned by the bank to the insurance company after its payment, about the last of June, and properly filed by the book-keeper ; but whether it had been indorsed or not he could not remember, and no later or further account is given of it except that it was mysteriously missing. Of all the papers relating to the claim, this alone could not be found. In 1877 the company failed, its affairs went into the hands of a receiver, and its secretary removed to Dakota, where his deposition was taken by appellee ; but he disclaimed all recollection of the particulars of the claim or of its settlement or even of the fact that he settled it.

From these circumstances, which are undisputed, it is not unreasonable to infer that the receipt was signed on the· 5th day of January, 1875; that if not afterward altered as to the amount it was without any statement of it when signed; that nothing had been or then was received by O'Bannon except the check and note amounting to $2,000, and that these were received to be, so far as he could make it, a settlement in full of the claim on the policy. And the facts so inferred fully explain the receipt and overcome its *prima facie* effect as evidence in this case.

Counsel are forced to admit the probability that it was signed

at the time and in the condition stated, but argue that if O'Bannon afterward collected the $3,000, or by signing it in blank enabled the secretary, by inserting the full amount, to collect the $3,000, his estate is liable therefor to appellant. As already intimated we apprehend not, unless such collection was in pursuance of an intention formed before his settlement with appellant; for otherwise the fraud would be wholly upon the company or its policy holders who contributed to make up the amount, and not at all upon him. Nor is this claim predicated upon negligence whereby the amount was lost to him; and if it were O'Bannon might have signed receipt in blank as to the amount without any great degree of negligence, for either or both of two reasons: first, that being ntended as a receipt in full it was immaterial to him and his principal what amount was specified; or, second, that the settlement for $2,000 was not understood by him or the secretary to be binding until ratified by appellant, and so the true amount to be inserted was still uncertain.

The only other direct evidence produced by appellant upon the issue now under consideration was the testimony of Elias W. Miller, who stated that in April or May, 1875, O'Bannon told him he wanted to ask a favor; that as agent of appellant he had collected on his mother's policy $5,000, and settled with him for less, but not for how much less; that appellant did not know what he had collected; that he had kept a part of the money for what he had done about a suit of Mrs. Vigus against the city of Litchfield; that he feared appellant's relatives were going to give him trouble, as they were complaining that the insurance company had not paid him enough, that he knew witness was a friend of appellant and wanted witness to advise him to stand by the settlement he had made, but not to speak to him about it unless he first spoke to witness or trouble ensued over the matter. He further testified that appellant never did speak to him about it and witness had never spoken of these statements to anybody until a few days before, when he met Dr. Wheeler, a brother-in-law of appellant, who told him of this litigation, and he then told the doctor of this conversation.

Vigus v. O'Bannon.

If this testimony were believed it would of course settle the question. What the court below thought of it we have no means of knowing, but there are circumstances that raise serious doubt as to some portion of it. The conversation is stated to have occurred ten years before it was related. On its face it is somewhat improbable if not unnatural. Counsel accounts for it as a "confession" forced by conscience, and made to an old friend, for relief, if not resorted to as a refuge from suicide. But it certainly was not accompanied by penitence, as is usual with confession. It has some appearance of an attempt to enlist aid to conceal his crime and hold on to its fruit from a known friend of the party to be wronged. O'Bannon had not then received the money, at least not from the bank, but only a check for it, and that not payable to himself but to appellant; so that to realize upon it a forgery or falsehood as foul was necessary, since his authority to use the name of the payee, if he ever had any, had long since ceased. The voluntary taking of such a risk of betrayal and its consequences was not to be expected; yet the request made of the witness was of a character to be received with indignation and resented by instant exposure. He admitted, also, that since the death of O'Bannon, his widow and executrix, the appellee here, had sued him on a note before a justice of the peace, and though he was successful in that court she took an appeal and got her judgment. So it appears that for ten years and so long as O'Bannon lived he was silent, and when death had made contradiction impossible and he had veen sued for a debt by the surviving widow, he spoke. His silence and his speech, under the circumstances of each respectively, seem alike discreditable. Still further, an attempt was made to impeach him generally. The court limited the number of witnesses on this subject to six on each side. Each produced so many and offered more. We do not say how far the attempt succeeded or failed. Observation teaches that men in general are reluctant to impeach a neighbor and are apt to speak softly and with qualification, under oath, of the general reputation even of those whom they know to be discredited. Without knowing the witnesses or hearing them tes-

tify, a just idea of the real force of their testimony can hardly be formed. It is perhaps due to him that we should say the impeaching evidence, as it appears in the record, was not very strong. But it was entitled to be considered, and it was for the judge who heard it, as for a jury, to determine its weight. If he thought that in connection with the circumstances above referred to as affecting the credibility of Miller and the other undisputed facts of the case it was sufficient to overcome or balance his testimony, we see no sufficient reason for overruling his judgment on that point.

It seems that on the 1st of February, 1875, the executive committee of the insurance company assessed against its policy holders the sum of $2,500 only, for the payment of this death loss, but the notice to them called for a sum *per capita* which in the aggregate would amount to $5,000. It is quite likely, since they were assessing for twelve losses for that month, of which some were of $5,000 and others of $2,500, that the latter was assessed for the payment of the policy in question, through inadvertence. The fact does not affect our judgment herein, because it is clear that the amount paid on account of this loss was $5,000.

Several witnesses, including a son of O'Bannon, testified that on his return from Chicago in January, 1875, he told appellant, and often afterward repeated it to him and other members of the family, that the company disputed the claim because of a letter or letters from an uncle and three aunts of appellant, who were named, to the effect that his mother had been afflicted with a cancer for years before she was insured, and finally died of it, and that he saw such letter or letters in its possession; and some of them added that in consequence of this statement appellant broke off family relations with these relatives until after O'Bannon's death.

The uncle and one of the aunts mentioned then resided at Litchfield, the two others at St. Louis. All were sworn and offered as witnesses to prove they had never so written to the company or anybody else; but the court, upon defendant's objection excluded them. A surgeon from St. Louis was offered on behalf of defendant to prove that she was operated

upon and treated for cancer in that city some years before
the policy was issued, but he was excluded also. We are in-
clined to think the evidence relating to the letters should
have been admitted, not because it would at all affect the
proof that O'Bannon had not received the $3,000 or the
check for it when he signed the receipt, but as bearing, in
connection with other evidence, upon the question of a fraud-
ulent intention, or whether he had formed any at that time,
in conjunction with Edwards or otherwise, with reference to
it. But we are not disposed to reverse the judgment on ac-
count of its exclusion, for several reasons. As it turned out
we think it would have amounted to no more than ground
for suspicion that there may have been such intention, and
would not have supported a finding that there was. The
head book-keeper was permitted to testify that he had care-
fully examined all the papers in the office relating to this
claim and found no such letters, nor ever heard of any,
though he would if any such had been received. This sub-
stantially covered the same matter, and no doubt the judge
was satisfied, as we also assume, that no such letters were
written.

We are not satisfied, however, that O'Bannon said he saw
them. It is possible that on that point the recollection of the
witnesses, whose honesty is not doubted, was at fault. It ap-
pears by a letter to the company from one of its agents that
it had been informed of a personal injury to Mrs. Vigus
before the date of her policy, from an obstruction of a side-
walk in Litchfield, for which she had recovered damages, and
also that the secretary had written letters to appellant in
regard to her health which were not produced " having been
burned by him, as he stated, nor their contents disclosed; "
nor need there be any question that the matter of a cancer
was spoken of by O'Bannon, nor that the relatives named were
mentioned as being reported to have given information about
it. What he said on that subject was not to appellant alone
or in confidence nor confined to a single occasion. It long
continued to be talked of by him to and among the different
members of the family. From these circumstances, after so

long a time and through the repeated conversations on the subject since his death, with inevitable variations and additions, that would naturally take place in the family, in view of this litigation, some of them may well have come to think he so reported. The statement that he understood such letters had been written, or that the company so claimed, would have fully answered his purpose, whether it was fraudulent or not, to get appellant's ratification of his settlement. But such a lie as is here charged was so needless, so likely to provoke denial and lead to investigation and exposure with such serious consequences to him, that to believe he told it and repeated it from time to time, to different persons, with no charge of secrecy, and continued to live in the neighborhood of everybody interested to deny and disprove it, and yet was never convicted of it or even charged with it until after his death, certainly requires clear proof.

If, however, it is to be believed from the evidence in this case, then the fact would operate powerfully to take th claim out of the exception made by § 22 and leave it subject to the bar of the Statute of Limitations.

Appellant was a young but full grown man of business education and some experience. His claim against the insurance company was for $5,000. He knew of no reason why it should not be paid in full. He knew that by the proofs submitted and approved his mother was shown to have died of paralysis. His agent to collect the claim, and who had himself been a witness to prove the death from paralysis, returned with the report that he could get only $2,000, because her own brother and sisters, named and within easy reach, had informed the company in writing which he had seen, that she died of a cancer from which she had been suffering for twenty years. And thereupon he at once accepted the little that was offered, relinquished his claim to the large amount withheld, and broke off relations with his uncle and aunts without explanation of the cause, or any inquiry of them or of the insurance company as to the fact or reason of so injurious a communication. Such inquiry, made promptly, would have prevented the settlement, or at any time within five years

after, it would have discovered the cause of action here relied on, if any there was. Its omission, in any view, was unjust to his relatives and to himself.

The only excuse offered for it is his confidence in O'Bannon and the relations long existing between them. We think these insufficient. The law requires reasonable diligence. What degree of diligence is reasonable must depend upon the special circumstances of the case. Where relations of trust and confidence exist a lesser degree may be reasonable than would be so if the parties were strangers or dealing at arm's length, but in every case it must be reasonable under all its circumstances. Faith, however sincere, which neglects work where reason demands it, is not accepted by the law as a substitute for diligence.

But the rule referred to by counsel in this connection does not apply here. There is no evidence that appellant believed or suspected that his mother died of cancer or was suffering from it when she was insured. From his treatment of his relatives and the evidence admitted the contrary is to be inferred. His confidence in O'Bannon's statement should itself have caused rather than prevented inquiry. If the company had shown him such letters reasonable care and diligence with reference to his own interests would have required him to see the informants and be satisfied of the truth of the information before he settled with it.

We are of opinion therefore that appellant suffered no harm by the exclusion of this evidence, and if it had been received and the court had found that O'Bannon said he saw the letters or that the company declined to pay in full for the reason stated, it would have no less supported him in the conclusion we reach, that the claim is not within the exception made by § 22 of the Statute of Limitations. It was presented ten years after the cause of action, if any, accrued, and after the death of the party charged with the fraud. It is defended by his widow under very great disadvantages. She is not chargeable with any knowledge of the facts alleged by appellant and can derive no aid even by way of information or suggestion from him who must have had it and whose conduct

and character, so dear to her, are here in question. In such a case the statute, where it applies as a rule, is *prima facie* a just and necessary as well as a full protection, which should be denied only where the cause of action is both fairly proved and fairly shown to be within the exception. Both of these issues were made and tried. We need not say that the finding was clearly right upon either ; but we are clearly of opinion there was evidence sufficient to support it upon both.

It is said the court below improperly refused to hold certain propositions of law submitted for appellant.

As to the one numbered 2, we see no room in this case for any presumption of law to determine the question of notice, whether actual or constructive, and which is intended the proposition does not indicate. It depended on the evidence alone, which called for no presumption. If it was appellant's duty to make inquiry he is chargeable with notice of what the inquiry would surely have discovered. No. 3 is here a pure abstraction. As to No. 6, the law does not determine what evidence in a given case is to be deemed " satisfactory " and the proposition does not define what is " convincing." No. 7 improperly regards the receipt as the exclusive means of knowledge of the fact in question, and makes the law determine the sufficiency of a particular item of evidence. No. 9, if true as matter of law, which we need not decide, is important only where the evidence is exactly balanced, which can hardly be claimed to be the case here. No. 10 is substantially embodied in No. 5 given. The hypothesis in No. 11 lacks the necessary element of falsity of the report. If true, and made in good faith, the legal consequence stated would not follow. In reference to a collection " afterward " we have said above all that we desire. No. 12 made the qualification stated in No. 5 given.

We find no material error in the record.

Judgment affirmed.