O'Bannon v. Vigus.

MATILDA O'BANNON, EXECUTRIX,

v.

DARIUS L. VIGUS.

*Agency—Authority—Scope of—Forgery—Presumption of Innocence— Receipt—Effect of, as Evidence—Requests to Find—Questions of Law and Fact—Weight of Evidence—Limitations—Fraudulent Concealment.*

1. Where an agent's authority is limited to the settlement and collection of a claim, and he has reported to, and fully settled with his principal in the matter of the agency, the subsequent indorsement by the former agent of a check, in the principal's name, though the same was given as an install-ment on such claim, is not only unauthorized, but, unless done with the intent of at once taking the proceeds of the check to the principal, criminal.

2. The fact of such criminal act, near the close of a long life of apparent integrity, under no special pressure of need or greed, and in the face of great risk, is to be judicially found only upon clear and satisfactory proof. Something more than a bare preponderance of evidence, leaving grave doubt, is required.

3. Receipts in writing, while evidence against the signer of high character, are not conclusive, but are subject to explanation, correction or contradiction.

4. The weight to be given to such a receipt or admission, and the question whether it has been satisfactorily explained, is for the trial court to decide.

5. A request to find, in trial without a jury, that certain facts, if found to exist, would constitute such a fraudulent concealment as would prevent the statute of limitations commencing to run, should be refused, it being a question of fact, not of law.

6. Requests to find, should present propositions of law only, and in no case assume the existence of any fact in dispute. Such propositions should deal with the facts claimed only as hypothetical, and should state no fact even hypothetically, unless there is evidence tending to prove it.

7. When the court is asked to hold a proposition of law, based upon a hypothetical case, it should be correctly and completely stated.

8. It is not error to refuse a proposition of law already embodied in another holding.

9. It is not error to refuse a proposition of law when there is nothing in the case calling for its application.


[Opinion filed February 14, 1890.]


APPEAL from the Circuit Court of Montgomery County; the Hon. JAMES A. CREIGHTON, Judge, presiding,

Messrs. LANE & COOPER, R. McWILLIAMS and A. THORNTON, for appellant.

Verbal admissions ought to be received with great caution. The repetition of the statements of O'Bannon, ten years after they were heard, is subject to much imperfection and mistake. He may not clearly have expressed his own meaning, or the witness may have misconceived or misunderstood him. Without any intention a word may be forgotten or altered, which would change the meaning. Mr. Greenleaf says: "In a somewhat extended experience of jury trials, we have been compelled to the conclusion, that the most unreliable of all evidence is that of the oral admissions of the party." Greenleaf on Evidence, Vol. 1, Sec. 200; Bragg v. Geddes, 93 Ill. 39–60.

There was not sufficient evidence to remove the bar of the statute of limitation. "Every false affirmation does not

amount to a fraud. A knowledge of the falsity of the repre-
sentations must rest with the party making it, and he must
use some means to deceive and circumvent." S. S. & S. E.
Ry. Co. v. Rice, 85 Ill. 408.

There is not sufficient proof that O'Bannon knew the state-
ments complained of to be false; and if he did not, then fraud
can not be imputed to him. Tone v. Wilson, 81 Ill. 533.

The representations must not only be untrue when made
but they must be known to be so by the person who made
them, and they must be such as an ordinarily prudent man
would rely upon. Grier v. Puterbaugh, 108 Ill. 607; Hol-
dom v. Ayer, 110 Ill. 451; Mitchell v. Deeds, 49 Ill. 423.

This attempt to blacken the memory of the dead should
not be looked upon with toleration.

Fraud, on the part of O'Bannon, has not been clearly made
out. It can only be inferred from doubtful and equivocal
testimony, and from the absence of proofs. Walker v. Car-
rington, 74 Ill. 453.

Messrs. GEORGE L. ZINK and JAMES M. TRUITT, for appellee.

The evidence is overwhelming in support of the proposition
of fraudulent concealment of the cause of action, when
measured by the rule announced by the Supreme Court. If
Mr. O'Bannon received appellee's money, his conduct was
such as to remove the bar of the statute of limitations. When
this case was before this court on the first appeal, the court
affirmed the judgment of the Circuit Court, which was then
against appellee and in favor of appellant. You then said,
in discussing the statute of limitation: "In such a case the
statute, where it applies as a rule, is *prima facie* a just and
necessary as well as a full protection, which should be denied
only where the cause of action is both fairly proved and fairly
shown to be within the exception. Both of these issues were
made and tried. We need not say that the finding was clearly
right upon either; but we are clearly of opinion there was
evidence sufficient to support it upon either." If there is any
evidence to support the findings of the fact of the trial judge,
they will not be disturbed. Montague v. Dongan, Supreme

Court, Mich., 12 Western Rep. 447.   Our own courts, both
Supreme and Appellate, have by a long line of decisions held
that under the well established practice in reviewing courts,
the judgment of the lower court must be affirmed in cases
where there is no error of law, and the facts have been found
by a jury, on consideration of conflicting evidence, and the
verdict is not clearly against the preponderance of the evi-
dence, and where they had the witnesses before them.   The
findings of fact by the trial judge is entitled to at least as
much weight, and must be held at least as conclusive, as the
verdict of a jury.   We take it that appellee has a good case
without the testimony of Ryan, and with his testimony appel-
lee has conclusively shown that O'Bannon got the money.   By
Ryan we show that he was to get the money; by the receipt,
sustained and corroborated by Miller, and all the facts and
circumstances of the case, we show he did receive the money,
and having so shown, the Circuit Court committed no error
in rendering judgment for appellee.

In their brief, counsel say: "Fraud, on the part of O'Ban-
non, has not been clearly made out.   It can only be inferred
from doubtful and equivocal testimony, and from the absence
·of proofs."   We quote from the opinion of the Supreme
Court, Vigus v. O'Bannon, 118 Ill., bottom of page 347, where
they say: "In the investigation of a charge of fraud, courts
should be liberal in the receipt of evidence tending to dis-
close the true nature of the transaction.   Very slight circum-
stances, apparently trivial in themselves, when joined with
other facts, may afford irrefragable proof of fraud."   Bigelow
on Frauds, 476; Bump on Fraudulent Conveyances, Secs. 541,
560.

What circumstances will amount to proof of fraud can never
be matter of general definition.   The legal test is the suffi-
ciency of the evidence to satisfy the understanding and con-
science of the jury.   Fraud need only be proved like any
other material fact.   Carter v. Gunnels, 67 Ill. 270; Bullock
v. Narrott, 49 Ill. 62.

And when the circumstances proved are so strong as to pro-
duce conviction of the truth of the charge, although there
may remain some doubt, then it is proved.   This is believed

O'Bannon v. Vigus.

to be the extent of the rule that fraud must be proved. Bryant v. Simoneau, 51 Ill. 324.

PLEASANTS, J. This case has been before this court and the Supreme Court on the record of a former trial, and their respective opinions are reported in 19 Ill. App. 241, and 118 Ill. 334. Although quite fully stated in each of them, a restatement of it here seems necessary to an intelligible presentation of our views upon the record as it now stands.

It was a claim filed June 30, 1884, in the County Court of Montgomery County against the estate of appellant's testator for $3,000, charged to have been collected by him in 1875, for appellee, on a policy of insurance upon his mother's life; and to avoid the bar of the statute of limitations, it was further charged that the fact of such collection was fraudulently concealed—that appellee did not discover his alleged cause of action until late in 1883, and could not, by reasonable diligence, have discovered it sooner. The policy was issued by the Protection Life Insurance Company of Chicago, May 22, 1872, for $5,000, payable to appellee within ninety days after proof of death received. The insured died October 12th, proof thereof was submitted November 28th, an l approved December 16th, all in 1874. Early in January, 1875, O'Bannon, at the request of appellee, took the policy to Chicago to settle and collect the claim thereon. Upon his return a few days thereafter, he delivered to appellee the company's check on the Fidelity Savings Bank and Safe Depository of Chicago, dated January 5, 1875, and payable to appellee, for $1,000, and its note of the same date at sixty days, for the further sum of $1,000. He then told appellee that this was all he could get; that the company resisted the claim on the ground of alleged misrepresentations of the health of the insured, and that only through the personal friendship of his old acquaintance, A. W. Edwards, the secretary and manager of the company, he had been able to get the $2,000 as a compromise. Appellee was then but a little past his majority, had lost his father many years before, and his relations to O'Bannon had long been as nearly as possible those of a son. On his advice he accepted the check and note as payment in full, and signed

a receipt to that effect, which was immediately sent to the company, and was received by it on the 9th. It was expressed to be a receipt of payment "in full of all demands under the policy" therein specified, without stating any amount; was dated, like the check and note, on the 5th, and had been drawn up by the secretary himself, in the company's office at Chicago.

Appellee never received anything more on the claim. But on the 4th of March following, a check of the company was drawn on the same bank, payable to him and on account of said insurance, for $3,000, which check was returned by the bank paid, late in June, and was then placed by Mr. Terpenny, the company's bookkeeper, in its vault with the other papers relating to the case. And that was the last that was shown, or so far as appears, is known of that check. In August, 1877, the company failed and its affairs went into the hands of a receiver. All the other papers relating to this claim were in their proper place, but this check, carefully searched for, was never found. Edwards had control of the vault, though others in the office also had access to it until the failure. He removed to Fargo, Dakota, in 1879. There his deposition was taken in behalf of appellee, but was read in evidence by appellant. In that remarkable statement he denies all recollection of any settlement or even of the existence of this claim. Checks of the company were always signed by the president, if he was there, but the president remembers nothing of this one. By whom it was signed, how and by whom indorsed, when and to whom paid, and when, how, why or by whom abstracted, are all matters about which there is not a syllable of direct proof. But it was drawn by the bookkeeper by direction of the secretary, and delivered to him on the day of its date, and he, so far as is shown, was last in possession of it before its presentation for payment. On the 4th of March, the day of its date, as on the 5th and 6th, and generally before and for some months afterward, O'Bannon was at Raymond, in Montgomery county, as appears by entries in his handwriting on the books of the store there, though there were some days, and in some instances

O'Bannon v. Vigus.

several consecutive days, on which no such entries were made, and nothing was shown to fix his whereabouts at those times. There was evidence tending to prove he was at Chicago in April or May, or early in June, but none that he ever, after he returned the receipt from appellee—which was probably on the 8th of January—had any communication, direct or indirect, with the insurance company or the bank mentioned, or with any officer or agent of either, excepting only his alleged admission to the witness, Miller, to be considered hereafter. In the summer following he removed from Raymond to Litchfield, in the same county, where he had formerly resided and still owned a large amount of property.

For some time after the failure of the company, the management of its affairs by Edwards was the subject of much and severe animadversion. Among the incidents growing out of it was a suit brought by him against a Fargo newspaper company for libel. In that suit the deposition of appellee was taken on behalf of the defendant, at Chicago, in October, 1883, and while there on that occasion, he was informed by Mr. Terpenny that the company had actually paid $5,000 on his policy, and that a receipt for that amount, indorsed thereon, was signed by O'Bannon for him. This information seemed to surprise him greatly, but he could not then believe his old friend had so wronged him. In the deposition just referred to, he testified with emphasis to his unblemished reputation, and to his own implicit faith, founded on personal knowledge and experience, in his integrity and friendship. O'Bannon was then on his death-bed, and died on the 15th of the next month, in the county of Montgomery, at the age of about seventy-five years. During the last thirty years he had resided and done business in that county, and had accumulated thereby an independent fortune.

Appellee first brought a suit against Edwards for the recovery of this $3,000 and interest; but afterward, whether because he then saw no way to avoid the effect of this receipt as a defense for him, or for what other reason, if any, does not appear, dismissed it, and filed the claim herein as above stated. If it had any foundation in fact, then this old man, of

established reputation for honesty, who had no need of the money, who had contributed to the proof of appellee's title to it, who as a friend had undertaken to collect it for him, and who through so many years had been unfailingly faithful and generous to him, had at last betrayed his trust and by the basest of frauds robbed him of $3,000, sacred as the insurance upon his mother's life; had lived for nearly nine years thereafter with the burden of this crime upon his conscience and its fruit in his pocket, on terms of unbroken intimacy with his victim and his family and in the unabated esteem of his neighbors, and died without a sign of remorse or guilt. The County Court disallowed it, the Circuit Court, on appeal, trying the case without a jury, also disallowed it; and this court, on further appeal, affirmed that judgment, as well supported by the evidence, notwithstanding certain rulings which were recognized as erroneous, but for reasons stated deemed immaterial.

The principal issue of fact was whether O'Bannon ever received from the insurance company on account of the policy in question, anything more than its check and note of January 5th, which he delivered to appellee. If he did, it is conceded he must have received it by the check of March 4th. That check was made payable to appellee or his order. It was not indorsed by him nor by his authority. We thought the theory of appellee's case, which was that O'Bannon indorsed it, imputed to him the crime of forgery. Counsel now say the Supreme Court held it was not forgery. The assertion is unwarranted. What the Supreme Court said was, that he "may" have signed appellee's name to it "in the same way and under the same supposed authority as he signed such name to the receipt" on the policy. Upon such a question we necessarily form our own conclusions from the evidence alone, and feel at liberty still to insist, with all due respect, that upon the undisputed facts, even the largest charity must deny him the benefit of such a supposition. His agency and authority were limited to the settlement and collection of the claim. On the 8th of January he had fulfilled his mission and returned. On that day he settled with appellee, fully and finally, the matter of his agency—delivered over

O'Bannon v. Vigus.

to him all that he had collected, reported it as all he could collect, took a receipt "in full of all demands under the policy" and transmitted it to the company. That was the end of the business, and therefore, of his agency and authority in the premises, and he knew it; for he was a man of intelligence and large business experience. Short v. Millard, 68 Ill. 292. Hence, if on the 4th of March, or afterward, he indorsed that check, as agent or otherwise, he must have known it was not only unauthorized, but criminal, unless he then intended to carry the proceeds straight to appellee and thus obtain his ratification. But the theory of appellee's case excludes the idea of such intention. His counsel now claim, and quote from their former argument to show they always believed beyond a doubt, that the money was obtained on this check by a fraudulent conspiracy of O'Bannon and Edwards to deprive him of it. If he made it, we must think it was a "falsely making of * * * an indorsement of * * * a draft or order for money * * * with intent to defraud" the insurance company or the appellee, which the statute declares to be forgery; and that the Supreme Court, upon this point, was not fully informed as to the facts. The claim of appellee, then, charged the dead with actual fraud, involving a high crime. The fact of such a lapse, so near the close of a long life of apparent integrity, under no special pressure of need or greed, and in the face of such risks, is to be judicially found only upon clear and satisfactory proof.

In Walker v. Carrington, 74 Ill. 453–4, the Supreme Court say, that where such a charge is made long after the facts on which it rests transpired, and the party charged is dead, these circumstances are "quite important" in determining whether it has been "sufficiently proved," and make their own the following language of Judge Story in Prevot v. Gratz, 6 Wheat. 497–8: "Fraud or breach of trust ought not lightly to be imputed to the living, for the legal presumption is the other way; and as to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty to disturb their ashes and violate the sanctity of the grave, unless the evidence of fraud be clear, beyond a reasonable doubt."

It is conceded that the insurance company paid on this policy, in parcels, the full sum of $5,000—$2,000 on its note and check of January 5th, which it delivered to O'Bannon and he turned over to appellee, and $3,000 on its check of March 4th, to somebody not shown, no part of which was ever received by him. The controversy here relates solely to the latter sum, and the principal question of fact is whether O'Bannon got it or is responsible to appellee for it. The evidence relied on to prove that he did, as presented in the former record, consisted of (1) the receipt indorsed on the policy as follows: "Received of the Protection Life Insurance Company five thousand dollars, being the amount in full on the within policy;" which was signed in the handwriting of O'Bannon "D. Vigus by R. W. O'Bannon;" (2) the testimony of Elias W. Miller that in April or May, 1875, O'Bannon told him he had collected $5,000 on the policy; and (3) alleged representation by O'Bannon to Vigus and others, when he returned from Chicago in January, that he had there seen letters to the company from a brother and sisters of the insured, named, stating that she had died of cancer with which she was afflicted before the policy was issued; which representation, if made, is admitted to have been false—no such letter or letters having, in fact, been written.

Receipts in writing, being apparently deliberate admissions of the fact recited, are evidence thereof against the signer, of a highly satisfactory character. Every man of common sense knows that. They are given and taken for that reason, and for that only, and every man gives and takes them. They are so satisfactory that not every man knows they are not conclusive. But the law is that they are not. They may be explained, corrected, contradicted or in any way impeached, directly or circumstantially, by other writings or by parol, just as a verbal admission may be; and experience abundantly shows the wisdom of this law.

In this case, if the receipt in question, when signed, at whatever time, was in blank as to the amount, that fact would make it worthless as evidence to charge O'Bannon with any sum whatever. Or, if it was signed at any time before the

check of March 4th was issued, then also, although it may have been filled out when signed, it was worthless; for up to that time it is certain that he had not, in fact, received $5,000 or anything representing that sum, nor anything whatever on the policy except the check and note of January 5th.

It bore no date, but the proof was that it was written by Mr. Terpenny and delivered to Edwards on the 5th of January, at the same time with the check and note of that date; that by direction of Edwards he left a blank for the amount, and that at some unknown time afterward, the words "five thousand" were inserted in the handwriting of Edwards. The Supreme Court said there was evidence tending to show that these words and the signature "were written with the same ink and at the same time," but we think this was a mistake as to the time. Mr. Terpenny was of opinion that they were in the same kind of ink, a kind used by Edwards and different from that used by himself; but he ventured no further. He must have been a reckless witness to have undertaken to say, after the lapse of ten years, from mere inspection, whether they were written at the same time or at different times in the short period between January 5th and March 4th. And further, if this court was right in Collins v. Crocker, 15 Ill. App. 107, the question was not the subject of expert testimony, nor was Terpenny an expert.

We believed, from the evidence, that O'Bannon signed it in blank as to the amount, on the 5th day of January, 1875, and upon what he intended as a compromise and final settlement of the claim under the policy. This evidence may be classified as relating to (1) the object of O'Bannon's mission; (2) to what was in fact done in the course of it, and (3) to the understanding of those concerned as to its effect.

Appellee had been long employed in the store of R. W. O'Bannon & Son (John D. O'Bannon). He was then about twenty-three years of age and was looking to an interest in the business. To obtain it he needed money. This he had expected from insurance on his mother's life. He was impatient to get it at once upon submission of proof of her death

although it was not due until ninety days thereafter. But the company for some other reason hesitated to pay. In fact it claimed that the policy had lapsed, and had been reinstated only upon condition and assurance that her health was as good as when it was originally issued; that though it had received such assurance, it was in possession of evidence that in the meantime she had been materially injured in a fall in Litchfield, for which she brought suit against the city and recovered damages. Correspondence by mail proving unsatisfactory, it was determined that John D. O'Bannon should go up to Chicago and in person endeavor to arrange the matter; but finally, apprehending that it might be necessary or expedient to submit to some compromise, it was suggested that his father, who had long been acquainted with Edwards. could get better terms, and therefore he undertook it. He went not only to settle, but to collect the claim. What appellee wanted, and wanted at once, was money, or what would be presently available as a means of raising it. He wanted all he could get, and to get it at once was prepared for a compromise on the amount, if found necessary. With this object and understanding O'Bannon reached Chicago on Monday, which was the 4th of January, and on that day entered upon his negotiation with Edwards. On the 5th they had come to some agreement. That it was a compromise and final settlement for less than the full amount of the policy is highly probable from the facts that a compromise was anticipated by the claimant and his agent; that nothing was then due by the terms of the policy, nor would be for nearly three months; that the note and check for $1,000 each, and the receipt on the back of the policy in full (though blank as to the amount) were then drawn up by Terpenny and delivered to Edwards, while O'Bannon was in the office; that the receipt in full, to be signed by appellee, was also then prepared by Edwards; that the note and check and receipt from appellee were then delivered to O'Bannon and the policy was by him surrendered to Edwards; that Terpenny, though he continued to be the bookkeeper of the company and in the office with Edwards until its failure in August, 1877, never saw O'Bannon again;

and that the entries he then made on his books showed nothing more than the check and note of that date as paid or given on account of this claim, and that the note was for the "balance due" thereon. He testified that he made his entries generally according to direction or information from Edwards, and could not account for that of the note, as for the balance due, except upon the supposition of his understanding at the time that the check and note were a settlement in full. Edwards himself testified that it was the practice of the company, when it settled a claim, to pay at once all that was to be paid, whether in cash or note, or both, and that the transaction of January 5th, as shown by the papers and entries of that date, indicated a settlement in full for $2,000. Mr. Hilliard, the president, also testified that though he had no independent recollection of these transactions and could not tell just how he got the understanding, he had always known of this claim as one that had been compromised.

Both Edwards and O'Bannon were intelligent business men. It is not to be supposed, without proof, that the company's check and note for $2,000 were delivered without taking a receipt therefor. The one in question was prepared when they were delivered, and must have been intended to be signed by O'Bannon as the agent who received them, since another was also prepared to be signed by the absent principal. There is no pretense of proof that he ever signed any other; and hence the inference is almost irresistible, that he signed this at the time he received them. Nor is it to be supposed, in the absence of proof, that O'Bannon signed, as agent, a receipt in full while so large a balance as $3,000 was yet to be received. If more than the $2,000 was intended to be paid, no reason appears why the note given was not drawn to include it, or another given for it. For Edwards knew that this loss, according to the course of business, would go into the February assessment; that there were over eight thousand members liable to contribution; that five thousand, under the rule, would require an assessment for the full amount, if the full amount was to be paid; and that the call would be payable within thirty days. It was in fact issued on February 4th, and

so was due some days before the note which was given would
mature. He therefore knew the company would be as ready
at that time to pay a note for $4,000 as one for $1,000. And
O'Bannon knew that appellee wanted money or what would
enable him at once to raise it.

The fact, if, as we believed, it was a fact, that the receipt,
though expressed to be in full, was blank as to the amount,
awakened in our minds no serious suspicion. The policy was
to be retained by Edwards. Delivering the note and check,
he should have a receipt. Except as to the blank, the one
indorsed on the policy was in the form generally used upon a
settlement, and in the usual place. O'Bannon intended and
expected the $2,000 to be accepted as in full. But being so
much less than the amount of the policy, and perhaps so much
less than he and appellee had hoped, he did not assume, or
Edwards was not satisfied of his authority, to make a final
and absolute settlement for that amount, as appears by the
preparation of another receipt to be signed by appellee in
person. Being referred to him he might insist on more, or
a lawsuit as the alternative. The true amount to be inserted
was therefore not yet absolutely certain. O'Bannon might
well presume that when so ascertained that amount would be
inserted; and if not, being in fact received as in full, it would
be immaterial to him and his principal, whether any or what
amount should be inserted. Under the circumstances, then,
we saw nothing strange in his signing the receipt in blank as
to the amount, but rather the thing to be expected of a man
unconscious of wrong on his own part and without a doubt of
the honesty of Edwards. A guilty or suspicious one would
have been more apt to hesitate or refuse. It must be con-
ceded that this array of facts strongly tended to prove that
O'Bannon signed the receipt while it was blank as to the
amount, and when he had received nothing more than the
check and note for $1,000 each. If it warrants the belief of
either, it fully explains and overcomes the receipt, and any
liability of his estate on the claim of appellee must be estab-
lished by other and wholly independent evidence.

It should be further observed that every one of these facts

fully appeared in the case in chief as presented by the claimant, out of the mouths of his own witnesses and by documentary evidence introduced by him. Thus the receipt here relied on, as presented to be met by the defense, was already impeached, and by the party presenting it. It was impeached if not on its face, by the *res gestæ* of which it was a part. And it was presented to charge with fraud and crime one who was in his grave, who, when living, knew the facts, but being dead could not testify himself nor guide to other sources of information. Such being the state of the case and of the evidence on this point, the Circuit Court was asked to hold as the law applicable to it the following proposition: "The court holds that the receipt indorsed on the back of the policy of insurance in evidence in this case, the signature to the same being admitted to be in the handwriting of the said O'Bannon, is evidence of a satisfactory character that the said O'Bannon received the amount of money in said receipt specified, and that to do away with its force the testimony should be convincing, and the burden of proof to explain or contradict said receipt rests on the defendant." The Circuit Court refused to so hold and we held that the refusal was not error. But the Supreme Court, after referring to certain circumstances in proof as tending respectively to substantiate and to contradict the recital contained in the receipt, said that while "It was the province of the trial court to decide upon the value of these circumstances, as evidence, and also to pass upon all the other facts in the case," it was at the same time the duty of that court to "apply proper rules of law in determining what weight should be given to the receipt introduced, and what kind of proof should be required to overcome it, and what party should assume the burden of explaining and contradicting it;" and because the language of the proposition was almost identical with that used by that court in Winchester v. Grosvenor, 44 Ill. 425, and subsequently approved in Rosenmueller v. Lampe, 89 Ill. 212, held that its refusal was error.

We, too, held the opinion thus expressed, as to the province and duty of the trial court. We also held, however, that this

proposition did not lay down any rule of law, proper or improper, to be applied by the trier in determining what weight should be given to the receipt, but assumed to determine it for him absolutely; that testimony tending to do away with its force and more or less convincing, was already in the case on the plaintiff's side, and if sufficient—of which the trier was the exclusive judge—there was no such burden resting upon the defendant. The paper in question was not a record nor a contract, but only an admission which, whether written or verbal, is from its nature open to explanation and contradiction; and we then knew of no law that prescribed the weight to be given by the trier to any such evidence in a given case. On the contrary, we understood it to be settled that the court could not properly say of such evidence, as matter of law, that it was even *prima facie* of any particular weight or character, but at most only that it tended to prove the issue, and hence, that in this case it was for the trier alone to determine whether or how far this receipt was or was not of a satisfactory character, and whether or how far the explanatory evidence was or was not convincing. With such right and duty of the trier the proposition asked can not be reconciled. It does not state that admissions against one's interest is *prima facie* evidence of a satisfactory character, or that receipts or admissions in writing are even more satisfactory than those that are verbal, nor anything in the nature of a rule for determining the weight of evidence; but declares, absolutely, that this particular receipt is in law evidence of a satisfactory character that O'Bannon received $5,000, which can be overcome only by convincing proof to be produced by the defendant. The cases cited from 44 and 89 Ill. do not seem to us to sanction such an instruction. In neither was any question of law involved. The court, as was its duty under the statute then in force, was reviewing the finding upon the evidence, and as triers, determined in each case that it was wrong—being against receipts which were not overcome; and in that connection they said of receipts in general what is here said of this particular receipt. Thus, as a court they declared the rule, and as triers found the receipts in evi-

O'Bännon v. Vigus.

dence to be in fact within it. But they have more than once pointedly declared it a perversion of their language, so used, to embody it in instructions to govern triers in other cases. And if the opinion in this case is to be understood as announcing a different view and authorizing trial courts to instruct or hold as law that any specific evidence of this nature, in a given case, is or is not of any particular weight or character, we can see but little use in juries. Hence the refusal of this instruction did not suggest to us the possibility that the learned judge who tried the issue might have disregarded any rule of law for determining the weight, as evidence, of this receipt. This court, as reviewing triers, certainly held it to be *prima facie* conclusive, and no law is claimed to allow it greater force; but we also found it to be fairly overcome, and therefore no evidence at all to charge the deceased with anything more than he had accounted for. Of course it was possible, notwithstanding, that he might have received the $3,000 or any less sum besides, but this receipt, if false or blank as to the amount when signed, was no proof of it.

Of the next item relied on — the testimony of Miller — we shall have occasion to speak more particularly hereafter. Suffice it to say now it was in effect, that in April or May 1875—before the $3,000 check was paid—O'Bannon confessed to him confidentially that "he had collected $5,000 on the policy;" that he had reported it to Vigus as less, and so in the settlement with him had defrauded him of a portion of it; that he feared the relatives were going to give him trouble as they were claiming "the company had not paid enough;" that he knew witness and Vigus were friends, and therefore asked him as a favor, in case anything should be said to him or trouble should arise about it, to urge Vigus to stand by the settlement he had made. This statement impeached itself and the witness who made it. Both were further impeached by his conduct in reference to the matter. According to his account there was a direct proposal to him to become accessory, without fee or reward, to a gross outrage upon the rights of a young and confiding friend; to prostitute his own

professed friendship by advising him to abide by a settlement of which the witness knew nothing and was told nothing except that it was fraudulent. He met the unreasonable and dishonoring proposal without any expression of displeasure, or even a request for explanation or further information. He kept it to himself during all the eight years of O'Bannon's life, maintaining his relations with both the parties, and divulged it only after he had been prosecuted to judgment by the widow, and the claim here in suit, having been disallowed by the County Court, was pending on appeal. His general reputation for truth was also to some extent impeached; and the alleged admission was out of harmony with the character of the deceased and with the mass of undisputed facts in the case.

It would have been enough for us that the trial judge, who heard his testimony and all the evidence, did not believe him, or at least did not believe that O'Bannon's statement, if any was made, was accurately reproduced by him. But we also reached the same conclusion. Evidence of verbal statements, after the lapse of ten years, without any special circumstance to aid the memory of the witness, is liable to error in so many ways and for so many reasons that it is generally to be received with great caution. Every one of these reasons applies with special force in this instance. If O'Bannon said he "had settled a policy for $5,000"—meaning a policy issued for $5,000—it would have been entirely and naturally consistent with all else he was reported to have said; the request to witness would have been reasonable and fair, and his conduct afterward would have been fully accounted for without discredit to him. For nobody acquainted with the parties doubted that O'Bannon was a man of large experience and sound judgment in business matters, and especially interested in the welfare of Vigus. On these reasons Miller might well presume, without further information, that the settlement he had made with the company and reported to Vigus was the best that under the circumstances could be effected, and therefore honestly, and as the friend of both, advise Vigus to abide by it.

O'Bannon v. Vigus.

But ten years had now passed. It had been recently discovered that the company really paid $5,000 on the policy and that O'Bannon's name in his own handwriting was signed to a receipt indorsed on the policy and purporting to be for that amount. These facts appeared to be against him. This suit was pending, based upon them. He was dead and could give no explanation. His friends were surprised and confounded. How easy and natural for Miller, as an honest man, in view of these facts and recalling the interview testified to, as well as he could, to suppose that O'Bannon's language must have meant—though he did not so understand it at the time—that he had "collected $5,000 on the policy;" and if he was an unscrupulous man, with a grudge against the widow, the inference against his testimony would be stronger. For all the reasons thus stated or suggested we thought it should not be believed as against the dead.

Lastly, as to his alleged falsehood about the cancer letters, Mrs. John D. O'Bannon and Mrs. Wheeler, sisters of appellee, had testified that the deceased said he saw them, and John D. O'Bannon, his son, was also under that impression. The court below had refused to hear the testimony of the brother and sister of the insured, offered to show that they had never written any such letters or letter, probably regarding it as a collateral issue and immaterial in view of the admitted fact that deceased had not then received anything but the check and note which he delivered over. The Supreme Court say this was error. We also had so held, but thought it did no harm inasmuch as the fact was otherwise sufficiently proved and did not appear to be denied. There were no such letters, and it was and is conceded that O'Bannon's statement, if made, was knowingly false. It was wholly unimportant, however, if he did not afterward receive the money on the $3,000 check, or some portion of it. Thinking that in connection with the facts that he had been the agent to collect the insurance, that the $3,000 was paid to somebody, and that appellee did not get it, the false statement might tend to show that the deceased had conspired or formed an intention to get it and appropriate it, we proceeded to consider the evidence

upon the question whether he made it; and for reasons given the conclusion was, it was altogether too doubtful, and the bearing of the fact upon the main issue, if proved, altogether too remote and uncertain to justify a moment's thought of disturbing the finding of the court below. The Supreme Court say "there is no dispute about the fact that O'Bannon c'aimed to have seen these letters in Chicago," a remark which must have had reference solely to the treatment of the case by counsel in that court. The question, as presented by the record now before us, will be further noticed hereafter: At this point arose also a question under the statute of limitations, namely: Was the statement, if made, such as to fairly put appellee upon inquiry which would have discovered the alleged cause of action or defeated the intended fraud upon him? If so, his failure to make such inquiry was *laches*, the statute then began to run, and the claim when filed was barred.

There is no proof in the record that his mother was afflicted with cancer when the policy issued. Presumably he understood and believed she was not; for otherwise his claim for any amount of insurance was a palpable fraud. Then, upon information that the company had such letters, and wholly or in part upon the false statement therein contained, based its refusal to pay $3,000 of the claim he believed to be justly due him under its contract, should not a reasonable or any regard for his own good name and diligence with respect to his pecuniary rights have moved him to decline the offered compromise, at least for the present, and proceed to an investigation? Any inquiry of the relatives named as the writers, two of whom then resided at Litchfield, within easy reach, or of the company, would have satisfied him that the letters were forged or that O'Bannon had wilfully lied to him as to a material fact; and in either case the fraud intended would have been defeated and the claim for the full amount would have stood upon its merits. To this point counsel replied that in reference to this matter there was a relation of special trust and confidence between the parties, on account of which the law would justify Vigus in accepting as true, without further inquiry, positive statements of O'Bannon calculated to

O'Bannon v. Vigus.

prevent such inquiry and to conceal the cause of action. Such a relation having been shown in this case, four propositions of law were submitted on behalf of appellee, numbered respectively 5, 10, 11 and 12, of which the last three were refused. In this we thought there was no error, for the reasons that each of them seemed to be objectionable in several particulars, and all of virtue they contained was clearly given in No. 5. The Supreme Court make no allusion to Nos. 5 and 11, but quote in full Nos. 10 and 12, and say "they should have been held by the trial court to be the law."

No. 10 is, in substance, that if the evidence shows a relation of trust between the parties, and that O'Bannon, as claimant's agent, collected $5,000 on the policy; that on accounting, he concealed from the knowledge of the claimant "that he had collected said sum," but on the contrary stated the company disputed the claim and refused to pay it in full, and that he had only collected and could only collect the sum of $2,000 on a compromise, and advised claimant to accept it in full, which statements claimant relied on as true, and so, without further examination, did so accept it, "then the court holds that said O'Bannon fraudulently concealed the cause of action, and the statute of limitations did not commence running until the claimant discovered, or might by reasonable diligence on his part have discovered, that such cause of action existed in his favor."

The Supreme Court itself say this proposition "asked the court to hold that certain facts, if found to exist, would constitute such a fraudulent concealment as is contemplated by the statute." Does not this statement condemn the proposition? Whether there was such a fraudulent concealment, was purely a question of fact. Does not the proposition assume to determine it as a question of law? It does not purport to define fraudulent concealment and leave it to the trier to determine from the facts in evidence whether such a case was here established, but declares, certain specific facts, acts and declarations of the deceased, if proved, would in law constitute it. If there is the slightest shade of difference in principle between this and an instruction that if a party injured by a

railroad train in attempting to cross its track failed to look and
listen for it before making the attempt, such failure would in
law constitute negligence, we are unable to perceive it.
Again, there was not a syllable of evidence in the record to
support the hypothesis that O'Bannon, when he accounted
and made the statements and gave the advice mentioned,
had collected the full amount of $5,000. The receipt
indorsed on the policy bore no date, and any presumption to
the contrary was conclusively rebutted by undisputed proof,
oral and written, that the check on which $3,000 of the
amount was paid was not drawn until nearly two months
after such statements were made. The theory and claim of
counsel in argument is not that the fact of such collection was
then concealed, for there was no such fact to be concealed, but
that O'Bannon then intended and had conspired to make such
collection—presenting a different case and question, which
the proposition does not fit. With this hypothesis stricken
out the whole thing would be a wreck.

Still, again, if in the judgment of the trier the alleged state-
ment of O'Bannon that he saw the cancer letters might have
modified the duty as to further inquiry, otherwise resting on
appellee, ought not that statement to have been included in
the hypothesis of the proposition? We understood and stated
the legal effect of the trust relation to excuse the failure to
exercise the degree of diligence required in other cases, sub-
stantially as do the Supreme Court, but expressed a grave
doubt whether the rule applied here. For is not the question,
after all, did the party claiming to have been defrauded
exercise due diligence under the circumstances, whether the cir-
cumstances included the trust relation or not? That relation
would justify the party in believing the statement made, and
consequently also in pursuing such a course as would be reason-
able and appropriate under that belief; but the question would
still remain, what was the reasonable and appropriate course
under such belief? Had O'Bannon said no more than that he
had done the best he could and was unable to get a settlement
on more favorable terms, appellee might have been excused for
accepting it without further inquiry; but when also informed

that O'Bannon consented to the terms offered because of the surprising statements to the company, was it reasonable that he should ratify it and thus abandon a claim for $3,000 without inquiry of the parties said to have made them? Upon that question the trust relation, justifying his belief of what O'Bannon said, would have no bearing except to make the reasonableness of further inquiry all the more apparent. And was not that question also, like that of fraudulent concealment, one of fact for the trier, and not of law, as this proposition presented it?

No. 12 was, in effect, that if the evidence shows a trust relation, and that O'Bannon as appellee's agent went to Chicago to settle the claim, and on his return made the statements and gave the advice as set forth in No. 10, and appellee, relying thereon, ratified the compromise reported; "and if the evidence further shows that the said O'Bannon either before or after making said statements and representations, collected from said company on said claim an additional sum of $3,000, and concealed such fact from the knowledge of claimant, then the court holds that it was not *laches* for the claimant to rely on the representations and statements of the said O'Bannon, and accept and act upon them as true, and make no examination to discover whether they were true or false."

To be applicable to the case supposed of a further collection "after" these statements, should not the hypothesis here also have included a fraudulent conspiracy or intention already formed when these statements were made, to collect this additional sum? Without this might not the hypothesis as stated be true in every particular and yet wholly immaterial? Consistently with them all the settlement reported might have been made in absolutely good faith at the time. If a conspiracy was afterward formed to obtain from the company the further sum of $3,000, and in pursuance thereof it was obtained, upon whom was the fraud committed? Would the facts that the name and claim of appellee were used to obtain it and the whole transaction was concealed from his knowledge give him any right to it? As applied to the alternative case—of collection "before" these statements were made—which was

shown to have been impossible—what proposition could be more certainly invasive of the trier's province? Whether appellee was chargeable with *laches* was a distinct issue of fact between the parties. In its nature it was a pure question of fact. Yet the court is asked to hold that if the evidence showed certain acts and declarations of O'Bannon stated, the law is there was no *laches* on the part of appellee, and, there-fore, the trier must so find notwithstanding his clear judgment, from other facts also shown by the evidence but not embraced in the hypothesis, might have been that there was the gross-e st *laches*.

Unless the opinion of the Supreme Court in this case is authority for them, this court can make no defense of either of these propositions.

But further, had they fairly stated the law on the subjects to which they relate as applicable to the evidence, was it error to refuse them when the court held as law the one numbered 5, which was as follows: " If a party whose duty as agent requires him to make truthful statements and representations to his principal concerning the subject-matter of the agency, when inquired of by his principal in relation to such subject-matter makes positive statements and representations which are in fact untrue and which he knows to be such, but which his principal believes to be true and does not know that they are untrue, then the court ho'ds that as between such agent and principal it is not *laches* in the principal not to proceed to verify such statements and representations until he has reason to doubt the truthfulness of such statements and representa-tions." It is true this proposition does not expressly define fraudulent concealment. But this is also true of No. 10. It clearly implies, however, that such positive statements by an agent as are herein described would constitute it, and properly leaves it to the trier to determine whether those proved come within that description—which is a better statement of the law than that attempted in No. 10. It also recognizes the re'ation of principal and agent as one of trust and confidence, and fairly declares its legal bearing upon the question of *laches* here involved. Thus it contains the substance of all the law

referred to in the two refused, and in better form; and were it not that the Supreme Court has expressed an opinion to the contrary, we should still certainly hold, for the reason above given, that their refusal was not error.

The Circuit Court also refused the following: " No rule of law requires all the evidence, or the strongest evidence of the matters in dispute, but only that is excluded which, from the nature of the case, supposes evidence superior in quality or grade behind, in the power of the party whose duty it is to produce the same ; that is to say, the party whose duty it is to prove a fact must produce the best evidence which, from the nature of the case, must be supposed to exist of such fact and to be within the control of the party." It might be presumed that a proposition so elementary was not doubted by the court. But we have perceived nothing in the case calling for its application. The Supreme Court say, " the facts to which it was intended to apply were those bearing upon the question whether appellant (appellee here) had begun his suit within five years after the discovery of his cause of action ;" that the issue on his part—that he did not discover it until within five years—was a negative one, and that to establish a negative averment plenary proof is not required.

Whatever may have been the intention—which must be found mainly from the expression—we submit, on its face, that this proposition does not refer, either expressly or impliedly, to the distinction mentioned, but is predicated of averments generally, affirmative and negative, and is alike true of both. Nor does it relate to the sufficiency of evidence to maintain an issue of either kind, but is confined to its admissibility. Now, upon the admissibility of all the evidence offered on this issue, the court had already finally ruled, and all desired exception thereto had been noted. Whatever of error there may have been in any of these rulings, whether excluding or admitting the evidence offered, was thus fully preserved and no holding as to this proposition could add to or cure it. We are, therefore, yet unable to see how the holding or the refusal of it could have helped or harmed either

side of the case. The evidence offered by appellee on this issue was the statement of Terpenny that "he seemed to be greatly surprised" by the information as to the receipt on the policy, and the testimony of appellee himself. In one sense at least that of appellee would be of a superior grade or quality —being directly to the fact which must have been within his knowledge, while the other was to a circumstance or appearance from which it could be found only by inference. But the Circuit Court admitted the statement of Terpenny against objection by the appellant, and excluded that of appellee—not, however, on the ground of its supposed inferiority in quality or grade, but because the court held him incompetent under the statute to testify, of his own motion, against an adverse party sued as executrix. The Supreme Court say "he should have been allowed to state such facts, having reference to the date of his receiving the notice in question, as occurred after the death of R. W. O'Bannon;" and speak of the information from Terpenny as having been received after such death. But the court was mistaken as to the fact, or rather as to the time of its occurrence. It was proved, and was expressly conceded, that the information was given in October, 1883, and before the death of O'Bannon, which occurred on the 15th of the following month. He was, therefore, incompetent to testify to the fact, if it was a fact, that this information surprised him; nor can we conceive of any testimony he could have given to maintain this issue on his part that would not have involved the state of his knowledge, and consequently an inquiry into facts that occurred, before that event.

But for the errors thus indicated, the judgments of this court and of the Circuit Court were reversed and the cause remanded. It was then again tried without a jury before another judge, who found the issue for the claimant and rendered judgment thereon for $5,250 and costs, to be paid in due course of administration; from which judgment the present appeal was taken.

Counsel for appellee assume that the opinion of the Supreme Court substantially settles this controversy. We are told that "since the case was before this court on the

other appeal, the Supreme Court has settled the law contrary to what you (we) then believed it to be. Propositions of law, of a vital character, which this court held bad, the Supreme Court held good. Evidence then and still in the record was not then given the weight which it was entitled to receive."

The preceding statement was intended to show, fully and fairly, the state of the record upon which every question of law or practice touched by the Supreme Court arose, with the views taken of those questions by the two courts respectively. It does show, as does also the opinion in the 19 Ill. App., that this court affirmed the judgment below against appellee's claim, on the evidence relating to the main issue—whether O'Bannon ever received on the policy anything whatever, directly or indirectly, except the check and note of January 5, 1875. It shows we conceded that if he collected more before his settlement with appellee, or even afterward, if in pursuance of an intention then existing, he fraudulently concealed it; and that appellee did not have actual notice of it before October, 1883. It shows that upon said main issue we did allow to the receipt on the policy all the weight it was entitled to receive; that we treated the witness Miller and his testimony with all due charity, and conceded that no such letters as the cancer letters spoken of were written by Mr. Barrett or his sisters, or either of them. Thus upon this issue appellee certainly received in this court the full benefit of his 6th proposition, which had been refused, and of the testimony of his uncle and aunts which had been excluded—as he probably did in the court below notwithstanding such refusal and exclusion; and neither of the other errors indicated had any bearing upon it.

With these concessions of fact, and with the same understanding of the law as that expressed by the Supreme Court, we found that if there was any credible evidence whatever in support of this charge, there was clearly not such as is required to prove fraud as against the dead. The findings on the other issue necessarily followed; for if there was no cause of action, there could have been no fraudulent concealment of it, nor

any question of *laches* in respect to its discovery; and there-
fore no error bearing on these issues could be material.

But we deny that upon any point in the case the Supreme
Court "settled the law contrary to what we then or ever
believed it to be." We held there was no error in refusing
certain propositions of law, so called, and the Supreme Court
held there was; but the difference was between the views
taken of the propositions and not of the law. We always
believed the law to be that such propositions should state the
law only, and in no case find or assume the existence of any
fact in dispute; that they should deal with those claimed,
whether ultimate or evidentiary, only as hypothetical—leaving
the trier unembarrassed in the exercise of his exclusive func-
tions to find them absolutely, from the evidence alone, and to
determine the weight of such evidence as a whole, and of every
item thereof that is not in its nature conclusive; that they
should state no fact, even hypothetically, unless there is evi-
dence in the case tending to prove it; nor omit from the
hypothesis any of which there is such evidence and which is
material to be considered with reference to the conclusion
of fact to which, if established, the law declared would
apply; and that it is not error to refuse a proposition that by
reason of fault in any of these respects would be likely to work
injury, nor one that, though free from fault in itself, is in sub-
stance a duplicate of another that is held.

There is nothing in the opinion of the Supreme Court indi-
cating a different view of the law. According to our construc-
tion of the refused propositions each and every one of them
might have been properly refused for one or more of the
faults or reasons stated. Were it at all apparent that the
attention of the Supreme Court had been called to the points
thus made against them and it differed with us as to their true
construction, we would admit our mistake and fully accept the
correction; for we recognize the authority of that court to
determine conclusively not only the legal effect of a propo-
sition whose meaning is undisputed, but also the actual mean-
ing of it when that is disputed, as well as a pure question of
law. But under the statute then in force that court could not

officially know the reasons on which the judgment of this court was founded, and since it made not the slighest allusion to any one of them upon any one of the many points involved, we may doubt if it had any actual knowledge of them as our reasons. Nor need we hesitate to say further that even the highest courts are liable to overlook faults in "instructions" and "propositions of law," which are well known to be faults and become quite apparent when attention is particularly called to them.

Assuming, however, that the propositions were faultless and that their refusal and the exclusion of the testimony of Mr. Barrett and his sisters were errors which materially affected the finding of the Circuit Court, we repeat that they did not affect ours, and think we have here, as in the former opinion, shown why they could not. For all practical purposes we held the proposition No. 6 and admitted the testimony referred to. Had the court below so done and found any cause of action, we must have reversed the judgment— not merely because in our view it would have been against the weight of evidence, but because it would have found no sufficient support in the evidence on the part of the claimant, considered by itself. Our views upon that evidence have undergone no material change. And, therefore, unless the judgment now under review is found to be better supported, it should, for that reason, be reversed. This brings us, after so long a time, to the consideration of the present record; and the preceding discussion relieves us from the necessity of doing much more than to note the changes and additions deemed material. Counsel say that, excepting the additions "the facts presented by this appeal are as nearly like they were before as it is possible to duplicate a case ;" but are confident " the additional proofs will remove every objection interposed by this court to the validity of appellee's claim." We think there are some important changes as well as additions, and that they are all against the validity of the claim.

First, in the testimony of Miller. We have said that in the former record it was, in effect, that O'Bannon, confessing his fraud, requested the witness to prostitute his influence to

keep the victim in ignorance of it and secure to the wrong-doer the fruit of it, and therefore characterized his conduct in reference to it with some severity—especially as affecting his credibility. Counsel say we misunderstood him, and that his testimony did not imply an understanding on his part that O'Bannon had done any wrong. Let us see. He said, in terms, that O'Bannon told him *he had collected $5,000* on the policy; that *he had settled with Vigus;* that *Vigus didn't know how much* he had collected; and that he feared the relatives were going to give him (O'Bannon) trouble, as *they were claiming the company hadn't paid enough.* As he related it these were the important particulars of O'Bannon's brief statement to him. The facts were too few and distinct to confuse his understanding or burden his memory, and the inferences—too palpable to be avoided or unnoticed—were (1) that O'Bannon had reported the amount he claimed to have collected, for otherwise the relatives could not have understood what it was and so complained that it was not enough; (2) that he had reported it as less than $5,000, for otherwise Vigus would have known the true amount collected, and being the full amount of the policy there could have been no "complaint" against "the company;" (3) that by false representations he had induced Vigus to accept the amount reported and settle accordingly; and (4) that he had thus defrauded him of the difference between $5,000 and the amount reported. O'Bannon might as well have told him these facts directly. The request that followed was therefore as base a proposal as could well be made of a man to a man, and to some it would have been as insulting. Counsel seems to have forgotten that in their former argument they themselves treated O'Bannon's alleged statement as a "confession" of guilt, manifested by the facts he stated. Whatever they may now think of our comment upon Miller's conduct in reference to it, he seems to have felt its justice and force; for in respect to the very point and pith of the matter, his testimony in the record now before us is no more like that in the former than innocence is like guilt. He now disclaims any positive recollection of O'Bannon's language, or of the name

of the company then so readily given; which of itself would be well enough; but entirely omits the significant statement that *he said Vigus didn't know how much* he had collected, and also the reason why he feared the relatives were going to give him trouble—that *they were complaining that the company had not paid enough.* Why these were the very points, and the only points appearing solely from his own testimony, that discredited him. It may be presumed his attention had been called to the comments of this court upon the bearing of these statements, but whether so or not, we remain of opinion that his making them on the first trial did discredit him, and think his omitting them on the last discredits him still more. In this connection should be noted also the difference between the two records in respect to his general impeachment. It was felt to be due to him to say, before, that it was not very strong. On the last trial the court again limited the number of witnesses to be introduced on this subject, without objection. Appellant presented seven, the full number allowed—each of whom testified that his general reputation for truth was bad, though one said he would believe him under oath notwithstanding. Appellee presented seven also, to support him; but of these, presumably selected as the best, three admitted, even on direct examination, that it was bad or mixed.

It is said that some or most of the impeaching witnesses having at some time had a lawsuit with Miller, or having a relative who had, for that reason ought not to be believed. Without conceding quite so much force to the reason, we observe that all it has applies to Miller himself, who was formerly shown to have had a like difficulty with the widow, and now another also with the surviving partner of O'Bannon. Thus it appears to us the changes are all the same way, materially weakening the case of appellee so far as it rests upon the testimony of Miller.

Next, as to the cancer letters. Here the only question was whether O'Bannon claimed to have seen them. He had not seen them and the sole object was to fasten upon him a wilful falsehood. There was no other point to this evidence.

Mrs. Wheeler, a sister of appellee, testifies, as before, that he said he saw them or it—for she is not positive whether he said several letters or a joint one—and that it was dated at Litchfield but mailed at Nokomis; but while she then named her uncle and three aunts as the writers mentioned by him, she now names only two. This variance would raise no suspicion of her intention, but serves to show the effect of even the short time between the trials upon her recollection of a merely verbal statement. And we can not help thinking that the circumstance stated of the dating and mailing, goes very far toward explaining, while discrediting, the whole of her story and much of Miller's. In the light of his sense and character and relations to these people, the idea that O'Bannon on his own responsibility openly charged them with volunteering against their dead sister's son and thus sneakingly conspiring to prevent his getting a dollar from the company, and then told Miller that these same conspirators whose statement in writing he said he had seen in the company's possession were threatening to make trouble because the $2,000 it paid was not enough, is to be challenged, halted and carefully examined before admission.

Mrs. John D. O'Bannon, another sister, also testified before that he said he saw them and named the same writers. But she too now drops one of the aunts, and she does not state that he said he saw the letters. Her language is that he said "the reason they refused to pay the full amount was from the fact they had received letters from my uncle, Mr. Barrett, and my aunts, Mrs. Lea and Mrs. Stearn, saying that mother had died from cancer;" and again "that he found letters there." Neither of these forms of expression necessarily imports that he saw them. They might well be used to mean only that from credible information, or by inference from what he observed, he was satisfied the company had letters; and considering that the very gist of the inquiry was whether he said he saw them—pledged his personal veracity for the statement that such letters had been written—and presuming as we may, that counsel and witness so understood, it looks as if her conscience would not allow her, on reflection, to swear, as before, that he did.

The only other witness by whom the alleged statement was or is claimed to have been proved was John D. O'Bannon, the husband of the one last referred to and son of the deceased. He had an "impression" that his father represented that he had seen such letters from two of the aunts named, but which two he did not understand. He appeared to be candid, but was not clear and positive.

On this point also the changes in the evidence are against appellee. These changes and the new proofs increase our doubt that O'Bannon made the statement imputed to him and our confidence in the explanation we suggested of the positive testimony that he did. Neither of the witnesses pretends to give his language, but only their present understanding of its substance, which almost always involves inference. And it is remarkable that Dr. Wheeler, who speaks of the letters and their effect as the subject of "general talk in the store" did not before, and does not now, state even as his inference or understanding, that O'Bannon ever said he saw them.

The record before us discloses facts in relation to cancer upon which the company, if it had any intimation of them, might have plausibly threatened resistance of the claim, and also hints in relation to its financial condition upon which, in connection with the other matter, O'Bannon might have reasonably consented to a compromise on $2,000. It is shown that in the negotiation with Edwards the question of Mrs. Vigus' health when the policy was issued, or when it was renewed, was discussed, and the chances on execution in the event of a judgment suggested; and as such companies have many ways of discovering grounds for contesting or compromising claims against them, it is not improbable, though not directly shown (otherwise than by the alleged statement by O'Bannon), that the matter of cancer was specifically referred to. Appellee was intelligent enough to know that if the company really had such letters it would not have entertained for a moment any claim whatever on that policy, but would have answered his first letter with a prompt and peremptory refusal. No opening would have been left for negotiation. O'Bannon must have understood this, and it is therefore well-

nigh absurd to suppose he told appellee that he had seen them, upon any theory of the case. His object was to convince Vigus that the company would not pay more than $2,000; that if he insisted on more he must expect litigation and delay, and take the risk of losing the whole. For that purpose the statement that he understood or suspected or feared the company was relying on some such information, without indicating its source or precise character, would have been sufficient. It would not have made him responsible for any assertion of fact calling for investigation, nor given occasion to the uncle or aunts to attack him or defend themselves, nor could it have been disproved. Doubtless he did speak of a letter as received by the company and probably as shown to him, relating to the health of Mrs. Vigus, from a traveling agent who might well have written or begun to write from Litchfield, where he obtained his information, and not finished or mailed it until he got to Nokomis. The fact about the cancer, if known outside the family, must have come to be so through the members of the family, or the surgeons. Surgeons are not apt to publish such facts in the first instance. The members of the family at Raymond knew whether they had published them, and if they had not, they would naturally indulge in surmises as to those residing at Litchfield and St. Louis. If divulged at all, the matter would soon be known generally in the neighborhood, and the company be apt to get information of it, and by letters.

It is not difficult to understand from these circumstances how, through the many discussions following O'Bannon's report and settlement, revived after the lapse of years upon the discovery of the $5,000 receipt, embittered and perverted by this litigation and another unhappy family affair that incidentally appeared in the testimony, with the additions and changes that are inevitable under such conditions, the relatives at Raymond honestly came, in ten years, to believe the story as they tell it.

We think this explanation of the testimony, though merely inference from a few facts and the natural course of things, is rather to be accepted than the belief that such a man as

O'Bannon, in the position shown, told such a lie—so highly improbable on its face, "so needless, so likely to provoke denial and lead to investigation and exposure, with such consequences to himself—and repeated it from time to time to different persons, with no charge of secrecy, and continued to live for eight years in the neighborhood of everybody interested to deny and disprove it, and yet was never charged with it until after his death." It harmonizes with the undisputed facts of the case, as the testimony does not, and accounts for some that would otherwise be passing strange.

For example, the fact that though Vigus broke off relations with his uncle and aunts, neither he nor his sisters ever complained to them, or either of them, of the very extraordinary and injurious act in question. How could they have refrained if O'Bannon had, indeed, told them he saw these letters? But mere suspicion that they had by letter or otherwise said anything to throw a doubt upon his claim, arising as we have suggested, while it would account for resentful feelings, would be no basis on which to make complaint to them.

Again: Mr. Barrett soon heard of this talk, but evidently not as a charge definitely and responsibly made. He sent word intended to reach Vigus and his sisters and bring about a meeting, when he could dispel these suspicions and restore the former relations, but never intimated that he understood he was so charged, or supposed that O'Bannon had done him any wrong. After O'Bannon removed to Litchfield he asked him one day if he claimed to have seen such letters, and O'Bannon answered: "Sir, I never heard of such a thing." That ended the matter between them, as it would not had Barrett understood he was represented as having so claimed. In that case he would have confronted the person so representing with this flat denial, and the fact would have been brought out. Still again: The circumstance already alluded to, of his telling Miller that the relations were claiming the company had not paid enough. He could hardly have told that to a friend of Vigus whom he was requesting to talk with him, if he had himself then accused them to him of writing to the company that he was entitled to nothing. We

have not supposed that Miller's story was a pure fabrication. His last version may well be accepted with the single correction we suggested, viz., that O'Bannon said he had settled a policy for $5,000, but not, as Miller stated it, that he had "collected $5,000 on the policy." With that correction it would be natural, consistent with the other facts in the case and his own subsequent conduct, and reflect no discredit upon the character of either. So much for the changes in the testimony of witnesses examined on the former trial.

The new matter includes the testimony of two surgeons and others in relation to the treatment of Mrs. Vigus for cancer of the breast and of appellee's knowledge of the facts. It appears that she was treated for it in 1873 or the early part of 1874 and an operation performed. The surgeons were of opinion it had then existed in an active state for four or six months, and in a latent state for two years or more; but there was nothing more to show that she or the family knew or suspected it when the policy was issued. They must have known it, however, when the renewal was applied for, which was in September, 1874. We do not care to comment on this evidence, nor deem it very material except so far as it bears upon the probability that the subject was discussed between O'Bannon and Edwards, and the range of the surmises among the family and friends at Raymond, upon O'Bannon's return and report, and thereafter until the time of the first trial; and shows how the suspicion and surmises of one came in the lapse of time to be the assertions of others, and the common belief of all. O'Bannon's death and consequent inability to deny, correct and explain, exposed him especially to the dangers of misrecollection, misunderstanding, confusion and variation.

The principal additions relating to the main issue were the testimony of Charles A. Walker, for appellant, and Martin Ryan, for appellee. In January, 1875, and until the following June Mr. Walker was the attorney of the company. It was a part of his business, as such, to examine and settle claims against it. He had long been a prominent lawyer at Carlinville and acquainted with O'Bannon for many years. He took

part with him and Edwards in the negotiation for a settlement of the claim on the Vigus policy. It appears that he was not aware that O'Bannon was in Chicago at that time until he was informed of it by Edwards; that he then talked with each of them separately on the subject, and finally with both together, in his room over that of the secretary. There, in the presence of Edwards, he told O'Bannon that he had been instructed by him to resist this claim on the grounds that Mrs. Vigus was insured after she was injured by the fall in Litchfield, that the representations made to obtain the policy were false and that she was not a fit subject. He says the solvency of the company was also discussed; that he advised him to accept the $2,000 offered; told him it would be better for Vigus than to litigate, and that the probability was he wouldn't get his money if he got a judgment. His statement is clear and positive, that they then and there "came to the agreement to settle for $2,000;" that O'Bannon "accepted the proposition and seemed very well satisfied." No question is raised as to the truth or importance of this testimony. But the witness further states that no papers were then drawn up, and that he "had an impression that this settlement was made on a Monday morning" in the latter part of December, 1874, or first of January, 1875. The calendar shows that the fourth of January fell on a Monday, and the note, check and receipt (of Vigus) are all dated on the 5th. Upon these circumstances counsel contend that this testimony, though true, is shown to be of no effect by that of Ryan. He was the actuary of the company at that time and testified as follows: "About the first of January, 1875, in the office of the company in Chicago, at Major Edwards' desk, he introduced me to Mr. O'Bannon and they proceeded to talk about this claim. I can only state the substance. O'Bannon urged the settlement of the claim and *Edwards seemed disposed to favor him,* but said the claim had not been assessed for yet. O'Bannon desired some money immediately, on that occasion. Edwards agreed to give $1,000 down or a check for $1,000, and a draft or note at sixty days—I think it was, for another $1,000, *and the balance when the, claim was assessed for and collected.* Major Edwards then

handed me the proofs of loss and told me to see that it got
into the next assessment, to be sent out early in February.
Mr. Edwards called the bookkeeper and told him to draw up
a check for $1,000 and a draft or note for another $1,000,
which the bookkeeper apparently proceeded to do. The
bookkeeper's desk adjoined close by." The claim of counsel
is that the agreement testified to by Walker was abandoned
and the one stated by Ryan adopted and executed instead.
We can not so reconcile this testimony, but are forced to
reject the statements of Ryan which we have italicized. In
the first place it seems far more probable that the transaction
mentioned by Walker occurred on the 5th than on the 4th of
January. He said, "my impressions are that it was on a
Monday morning. Of course it is simply an impression that
has got on my mind. I don't know why I have got the impres-
sion." Aside from this, the evidence induces the belief that
O'Bannon did not reach Chicago before Monday morning;
that he first saw Edwards alone, and talked the matter over
with him; that Walker then saw Edwards and they dis-
cussed it; and it was after these three interviews that
the meeting in question took place. It is not probable
that they all occurred on Monday morning. Moreover,
it is not probable that after agreeing upon the terms of
settlement they postponed its execution. The papers required
to consummate it were a check, a note and two receipts—the
work of ten minutes and of a clerk. The natural course was
to go at once to the room below, which was the office of the
secretary and of the bookkeeper, who was to make the entries,
and close up the business. But even upon the other supposi-
tion, we are asked to believe that this secretary, who, notwith-
standing his friendship for O'Bannon, on Monday, for the
substantial reasons stated, in the presence and with the con-
currence of the company's attorney, committed himself to a
peremptory refusal to pay more than $2,000, and actually got
an agreement to settle for that amount, with which O'Ban-
non seemed well pleased, on Tuesday, without any new light
on the subject, and without the knowledge of the attorney,
was entertaining a proposition from O'Bannon to settle, and

was so " disposed to favor him " that he would have paid the full amount right down except that it had not been assessed and collected, and actually paid $1,000 down, gave the company's note at sixty days for another thousand, and a *verbal* promise to pay $3,000 more, to which all claim had been abandoned, as soon as it should be assessed and collected, and gave directions to have it assessed and collected as soon as possible. Considering further that nothing was yet due, that the financial condition of the company was not such as to justify any needless liberality in the settlement of claims against it and that the bookkeeper at the adjoining desk, who was probably within hearing of the whole arrangement, when he did " proceed to draw up the papers," proceeded further to enter the transaction on his books as a settlement for $2,000 and no more, the statement that the secretary then agreed to pay the further large sum of $3,000 seems but little less than monstrous. We can not believe it as against the other evidence in this case, upon the unsupported testimony of Ryan. After a brief experience as a lawyer, he had thought it to be to his interest to become connected with this company. His relations to Edwards were intimate. He was subordinate to, and doubtless to some extent dominated by him. Like Edwards, he went west not long after its failure; engaged in employments of different kinds, for short periods, at different places, and finally followed him to Fargo, where he resumed the practice of law and was his attorney in the libel suit against the newspaper company. He prepared the list of losses for the February assessment, by direction of Edwards, and in the list as presented to and approved by the executive committee this appeared as a loss of $2,500, which Terpenny said would have been the usual course if it had been settled at $2,000, because the company issued no policy for $2,000. We said before it was likely this happened through inadvertence. It does not seem quite so likely now. Walker's age, position and experience gave him greater right and reason to be independent in his judgment and action. His integrity is unquestioned. The evidence leaves the impression that these qualities moved him to sever his connection with the company in

June, 1875.  His statement is natural, probable in itself and from the known facts, and strengthens the belief that O'Bannon, on the 5th of January, 1875, settled this claim in perfectly good faith for $2,000, and took no part in the fraud afterward committed, and which, in that case, was a fraud upon the company and not upon appellee.

Any theory of the case consistent with the evidence which would make his estate liable, must involve a conspiracy with Edwards.  He must have known that appellee had settled finally in January.  Ever since the ninth day of that month he had his receipt " in full of all demands under the policy." He could not, then, have innocently ordered a check for $3,000 more in his favor to be drawn on the 4th of March following. The implication of Edwards is fully conceded.  Counsel say " we have always insisted, and believe as strongly as we believe anything, that it required more than one person to successfully perpetrate the fraud ;" and after quoting from the former argument what they said about " an officer of the company"— but naming none because none had been named by opposing counsel—proceed as follows: " But now that counsel have been driven to openly charge that Edwards abstracted the money, we reply that it was impossible for him to do so without a confederate at the other end of the line who had the confidence of Vigus, and no man had that as fully as Richard W. O'Bannon."

We understand this to mean that from the guilt of Edwards and other conceded or established facts, it would follow that O'Bannon was his confederate in the fraud.  Of course, if O'Bannon signed, as agent, a receipt expressed to be for $5,000, and told Miller he had collected that amount, and lied to Vigus about the cancer letters, and indorsed the check for $3,000, these facts would be evidence of his guilt without reference to that of Edwards.  But whether he did these things, or any of them, are the very questions in issue, and therefore can not be begged.  If he did not, there is no evidence against him, unless it is to be found in other acts of his own which are undisputed or proved, and the guilt of Edwards. The position, then, is that the guilt of Edwards, with other

facts established, shows that O'Bannon must have done these disputed things or some others which made him guilty also ; in other words, that Edwards could not have done what he did without the guilty aid of O'Bannon. And the argument here made in support of this position rests wholly on the supposed necessity of the co-operation of one " who had the confidence of Vigus." To what end was the co-operation of such an one necessary, except to obtain a ratification of the settlement he reported and a receipt in full to the company? Is not the argument, then, reduced to the strange assumption that he could not or would not have obtained these if he had in fact made the settlement as reported, and honestly believed it the best he could have made?

With the two receipts in his possession, Edwards needed no aid from O'Bannon. In any case he must use a forged indorsement, and take the risk of discovery by the company of the fraud upon it. These dangers could not be avoided or lessened by any such aid. An indorsement of the check by O'Bannon would have been just as false as an indorsement by Edwards, criminally or otherwise—no less. The money to be paid on it being that of his company, the bank would have accepted as valid any that he recognized, and he could doubtless have found a cheaper tool than O'Bannon. If O'Bannon had indorsed it, the chances of its abstraction would have been lessened and of its discovery—especially after his death— increased ; nor would Edwards have been so likely to forget the fact or so unwilling to state it ; for it would have charged O'Bannon and not him, with the money and the fraud, and prevented inquiry as to some other facts now shown. As to the other danger he had chiefly to fear Walker. The other officers and employes of the company seem not to have questioned his doings. He ordered and it was done. But Walker had personal knowledge that the settlement of this claim for $2,000 had been agreed on. The former record disclosed no particular reason for the long delay in presenting the check for payment. It now appears that Walker left the service of the company in June. Manifestly, then, the conspiracy, if any, must have been entered into on or before the 5th day of

January, when these receipts were prepared, and the one to be signed by Vigus, together with the check and note for $2,000 were delivered to O'Bannon; for afterward it would have been useless to Edwards, requiring him without consideration to divide the fruit, and increasing the risk of detection. But, in addition to the reasons already given for believing that O'Bannon then settled in good faith, the evidence shows there could have been no sufficient time before that for the arrangement of such a scheme of fraud. O'Bannon had nothing to do with the matter until just before he went to Chicago, nor any reason to suppose he would have. He went to Chicago expecting to compromise. Counsel admit that the negotiation of Monday, January 4th, resulted in the acceptance by O'Bannon of the offer of $2,000; that Walker took part in this negotiation, knew the reasons for the compromise and the fact of the agreement upon it. His presence and participation is, to our minds, satisfactory evidence that it was made in good faith. We believe this occurred on Tuesday and was the final arrangement, followed immediately by the delivery of the check and note for the amount agreed on. But supposing it to have been on Monday, who can for a moment suspect that after the settlement in good faith and for the reason so discussed, and before the close of business hours on Tuesday, either of these parties conceived and broached to the other the idea of taking from the company, ostensibly on account of this claim, the further sum of $3,000 to be appropriated to their own use, and arranged all the details of the scheme for realizing it and avoiding the dangers of detection, immensely enhanced as they were by Walker's knowledge? This would have been impossible even to old pals in crime, and nothing is shown of the relations of these parties to warrant a suspicion that either would thus abruptly confess himself, and dare assume the other to be capable of such infamy.

But without such a conspiracy O'Bannon could not have been guilty. The participation of Edwards was indispensable. Otherwise the check for $3,000 could not have been obtained. But since Edwards did not need the aid of O'Bannon, the fact

of his guilt, if conceded, is no proof against O'Bannon, but rather tends to exonerate him.

We have shown the improbability, nearly approaching the impossibility, of such a conspiracy. There is not in this record a syllable of direct proof in support of it as a distinct fact; nor a single fact undisputed or satisfactorily proved, from which it can be inferred.

That O'Bannon was the agent of appellee to settle and collect the claim ; that as such he received from the company $2,000, which he paid over and reported as the full amount received ; that two months thereafter the company's check for $3,000 more, ostensibly on account of this claim and payable to appellee, was by its secretary delivered to some person not shown, or fraudulently retained and used for himself ; that two months later it was paid by the drawee, upon an indorsement not shown, to some person also not shown; and that O'Bannon was in Chicago at some time after its date and before its payment—these may be established facts, but of themselves they do not tend to prove that O'Bannon had any knowledge of the check or fraud, or in any way, directly or indirectly, derived any benefit from it. That he signed the receipt on the policy after that check was drawn, or thereafter had any communication with or from any agent of the company or the bank, or indorsed it, or took or received anything by means of it—these are at most but inferences from independent evidence claimed to prove other facts, and therefore lend no support to that evidence. That evidence consists of, and the case for appellee rests wholly and solely upon, the face of the receipt as it now appears, the alleged admission to Miller, the alleged falsehood about cancer letters, and the testimony of Ryan.

One living witness, and so far as appears only one, certainly knew at one time whether the words " five thousand " were in the receipt when signed. It was for his interest to prove they were. He was examined, but did not venture to say it. Perhaps it was possible for such a matter to escape his recollection. It is harder to believe he could have forgotten what disposition he made of so large a check drawn by

his express direction. That stands so related to the receipt that his failure to charge O'Bannon in respect to it may be regarded as significant, though negative evidence in his favor upon that point and on the whole case. But whether these words were in or out, the receipt was fairly explained and overcome. Then the testimony of Miller was without corroboration. O'Bannon was not here to deny or explain the statement imputed to him; but on its face and by the circumstances it was shown to be a misrepresentation, whether intended or not. The alleged falsehood about cancer, if proved, would bear but remotely and feebly upon the main issue. Certainly it would be slender ground on which to base a finding and judgment for over $5,000. We think it was not proved. Without the testimony of Ryan, each of these three items depends alone upon the other two for corroboration. All else in the record is consistent with the innocence of O'Bannon. So far as it tends to prove any fraud it points suspicion against another, and not him—another, whose guilt would account for all the facts proved, without involving him. Each, in our opinion, is so far impeached, either by itself or other evidence introduced on the same side, that it can not stand alone, and much less support any other.

Then, without the testimony of Ryan, appellant would not have been put upon her defense. According to that, Mr. Terpenny must have witnessed the scene described, for he drew up the papers while O'Bannon was in the office, and never saw him there but once. Yet he does not speak of Ryan's presence. He heard no promise to pay $3,000 when it should be assessed and collected, nor had he any such understanding from any source. His entries show his understanding of a settlement then finally made, and for $2,000. He states no conversation between Edwards and O'Bannon as then had. The idea we get from him is, that O'Bannon simply waited while he, by direction of Edwards, drew up the papers. That would have been natural if they had just agreed upon the terms in the room above. His statement is opposed also, in some degree, by the fact that the company had some plausible

reason to contend for a compromise and Edwards knew it. The transaction, as he relates it, was not according to business methods, though both the parties to it were business men. His relations to Edwards, and his agency in the assessment proceedings upon this loss, have been before referred to. But if, notwithstanding what may be urged against it on its face, and from other evidence on the same side, it required proof on the part of appellant to overcome it, such proof was abundantly furnished by the testimony of Walker, supported as it is by the known facts otherwise proved on both sides.

To our minds, the consistent and credible evidence in this record strongly tends to prove that O'Bannon was an honest man and a true friend of appellee; that the claim against the insurance company was one which might well be compromised; that appellee expected it would have to be compromised; and that it was, in fact, compromised. We think the finding was against the weight of the evidence; that in a case of this kind, something more than a bare preponderance, still leaving a grave doubt, is required of the plaintiff; that the court should recognize some value in a good name, some protection in a grave. We can not defer to it as a finding under superior advantages, upon conflicting evidence, for there are also conflicting claims to such deference. Other courts have found differently upon evidence not different from that now before us, except as it was stronger for appellee or weaker for appellant. While holding the views herein expressed as to the questions arising, if any do arise, under the statute of limitations—that it was for the trier to determine whether appellee was fairly put upon inquiry by the alleged statement of O'Bannon concerning the cancer letters, and whether he used due diligence to prevent the alleged fraud—we reverse this judgment on the evidence upon the main issue—whether there ever was a cause of action.

The case seems to involve questions of fact that are few and plain, with but little real occasion for instructions or propositions of law. Under our system of practice, the danger that lies in a free use of them in such a case is out of all proportion to the benefits. With a view to ending the unfortunate

litigation with as little more expense and delay as may be, consistently with justice and the law, we are constrained to add that some of those given for appellant, were, in our judgment, not well considered.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*